## PACIFIC NORTHERN AIRLINES, Inc. v. ALASKA AIRLINES, Inc. (PAN AMERICAN AIRWAYS, Inc., et al., Interveners).

### No. A-4768.

District Court, Alaska.
Third Div. Anchorage.
Aug. 7, 1948.

John E. Manders, of Anchorage, Alaska, and Gerald P. O'Grady, of Washington, D. C., for plaintiff.

Pogue & Neal, of Washington, D. C., and McCutcheon & Nesbett and Cuddy & Kay, all of Anchorage, Alaska, for defendant.

J. Gerald Williams, of Anchorage, Alaska, and R. E. Robertson, of Juneau, Alaska, for intervenor Pan American Airways, Inc.

Davis & Renfrew, of Anchorage, Alaska, for intervenor Northwest Airlines, Inc.

John F. Sonnett, Asst. Atty. Gen., Edward J. Hickey, Jr., Sp. Asst. to Atty. Gen., H. Don Reynolds, Chief, Enforcement and Litigation Section, CAB and Robert Burstein, Atty., CAB, both of Washington, D. C., George Kurtz, Atty., CAB, and Raymond E. Plummer, U. S. Atty., both of Anchorage, Alaska, for intervenor Civil Aeronautics Board.

DIMOND, District Judge.

The plaintiff, Pacific Northern Airlines, Inc., the defendant, Alaska Airlines, Inc., and the two corporate intervenors, Pan American Airways, Inc. and Northwest Airlines, Inc., are all certificated air carriers. Under their respective certificates the plaintiff and the defendant are authorized to engage in air transportation only within the Territory of Alaska and not between Alaska and any of the several States. The two corporate intervenors hold certificates authorizing them to engage in air transportation between Alaska and the States, and they will be hereinafter referred to as Pan American and Northwest, respectively. The intervenor, Civil Aeronautics Board, will be hereinafter referred to as the Board.

The plaintiff by its certificate is authorized to so engage in air transportation over a number of routes in the First and Third Judicial Divisions of Alaska, among them being a route between the terminal point of Anchorage, intermediate points of Cordova and Yakutat, and the terminal point of Juneau, Alaska, for the carrying of persons, property and mail. The distance between Anchorage and Juneau is approximately 600 miles. Round trip flights are made by plaintiff over this route daily.

Pan American, in addition to its certificated routes within the Territory of Alaska, is similarly authorized to operate between the terminal point of Seattle, Washington, the intermediate points of Ketchikan and Juneau, Alaska, and White Horse, Yukon Territory, Canada, and the terminal point of Fairbanks, Alaska. The distance between Seattle and Juneau is 900 miles and between Seattle and Fairbanks 1560 miles. Over the Seattle-Fairbanks route Pan American operates at least one round trip daily with intervening stops at Ketchikan and Juneau, carrying persons, property and mail. In addition to that service, the company operates what was called in the testimony a "milk run" three times weekly between Seattle and Juneau with intervening stop at Ketchikan.

Northwest's certificated operations, so far as they are of concern here, cover two routes, one between Seattle and Anchorage, a distance of about 1500 miles, and the other between Chicago, Illinois, via Minneapolis, Minnesota, Edmonton, Alberta, Canada, White Horse, Yukon Territory, Canada, and Anchorage. The distance by air from Chicago to Anchorage is 3,035 miles.

The plaintiff and Pan American have a working agreement, with established through rates, for continuous operation between Anchorage and Seattle, the meeting and transfer point being at Juneau.

The defendant by certificate is authorized to operate over various routes in the Second, Third and Fourth Divisions of

Alaska. Daily round trip flights are made between Anchorage and Fairbanks, a distance of 280 miles, and four round trip flights each week are made between Anchorage and Nome, a distance of 525 miles carrying persons, property and mail. In addition to the Alaskan cities mentioned, the defendant is certificated to serve some 70 small communities in Alaska.

Since May 1, 1947, the major portion of defendant's revenue from operations has been derived, not from the operations over its certificated routes, but from non-certificated operations, between points in Alaska, principally Anchorage and Fairbanks, and points in the several States, mainly Seattle and Everett, Washington, and, since January 3, 1948, Great Falls, Montana, Minneapolis and St. Paul, Minnesota, and Chicago, Illinois. Occasional flights are also made by defendant between Alaska and other cities in the States. These operations of defendant between Alaska and the States are, defendant claims, fully warranted and justified under the provisions of Section 292.2 of the Economic Regulations of the intervenor, Civil Aeronautics Board, which will be hereinafter discussed. Seattle and Everett, Washington, are only a few miles apart and may be considered as virtually one terminal point.

The plaintiff in its complaint in this action alleges that the defendant, without the authority of any certificate of public convenience and necessity granted to it under the provisions of Section 401(a) of the Civil Aeronautics Act, or any order of exemption therefrom, has been engaged in air transportation as a common carrier between Anchorage and Seattle and between Anchorage and cities in the States, in violation of Section 401(a) of the Act and Section 292.2 of the Regulations, and in direct competition with the business of the plaintiff over plaintiff's certificated routes and to plaintiff's material damage.

The intervenors, Pan American and Northwest, make substantially the same averments in their several complaints in intervention, alleging unlawful air transportation by the defendant with consequent damages to intervenors, as are set up in the plaintiff's complaint in this action, and each asks for similar relief.

The intervenor, Civil Aeronautics Board, has intervened as the agency of the Government charged with the duty of enforcing the Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq., hereinafter referred to as the Act. The Board's complaint in intervention contains averments as to information received by the Board of unlawful air transportation on the part of the defendant and averments that defendant "has established and is engaging in a regular and scheduled air transportation service * * * in violation of Section 401(a) of the Act." The Board asked leave, and was granted permission, to intervene in order to fully protect the public interest and for the better enforcement of the law. The Board makes no claim or even suggestion of primary jurisdiction in the Board, and has expressed the view that the jurisdiction of the court was properly invoked under Section 1007(a) of the Act, hereinafter quoted.

█ Between May 1, 1947, and June 1, 1948, the defendant operated its planes for carriage of both persons and property between Alaska and the States over routes for which it had no certificate. A large part of this traffic was admittedly of common carrier nature, and in such traffic the defendant's planes made 482 flights between some point in Alaska and some point in the States, equivalent to 241 round trips. In each of these operations the defendant sought the traffic and advertised for it, and carried all offered to the limit of its capacity, for compensation or hire; and, therefore, as to such operations it was beyond doubt a common carrier.

During the same period the defendant made 242 additional flights between Alaska and the States, 78 of which, the defendant asserts, were not of a common carriage nature but were either charter flights or made under such contracts as not to amount to common carriage, and the remaining 164 of which were made in the carriage of several millions of pounds of building supplies for Birch, Johnson and Lytle, an associa-

tion of contractors engaged in extensive military construction in Alaska, hereinafter referred to as BJL. It is asserted by the defendant that the BJL operations were made under special contracts so that the defendant did not act therein as a common carrier. Plaintiff and all of the intervenors claim that the operations for BJL were largely, if not entirely, of common carrier nature. The proof shows that BJL sought for the carriage of its supplies to Alaska by air at the cheapest rate obtainable. Defendant undertook the work, purchased two DC 4's—or C 54's—and chartered another, all of which were fitted for cargo carriage, for the agreed price of $3230 for a round trip between Seattle and Anchorage and $3730 for a round trip between Seattle and Fairbanks, agreeing to carry a minimum load of 17,000 pounds and a maximum load of 18,500 pounds. It appears that all of such agreements were approved by a representative of the United States Army Engineers, that such approval was indispensable, and that in order to obtain approval it was necessary to show that the price was the lowest offered. No guaranty was ever given by BJL that the arrangement would be continued on anything but a temporary basis because BJL, under Army direction, as claimed, was bound to accept the lowest price that was at any time offered by a responsible bidder. While some of the BJL property and all of its personnel moving by air between Alaska and the States were carried by the certificated carriers, plaintiff, Pan American and Northwest, most of the BJL property moving between the States and Alaska was carried by defendant.

The defendant claims that neither the plaintiff nor any of the intervenors was equipped to carry the BJL cargo, that they had no planes suitable for the purpose, and points out the fact that until June 1, 1948, all of the cargo carried out of Seattle to Alaska by any of the intervenors was carried in their passenger ships. Testimony indicates that at least fifty per cent, perhaps more, of the cargo carried for BJL was of such nature that it could not have been carried in any of the planes then being operated by the intervenors between Seattle and Alaska, because the doors of the ordinary passenger planes then used by intervenors were too small to admit a considerable part of the cargo carried for BJL, because some of the cargo, such as explosives, could not be carried in a passenger carrying plane, and for other reasons.

In all of these operations the defendant's prices for carriage were well below the tariffs established by the certificated carriers for identical service over the same routes.

During the period mentioned, from May 1, 1947, to May 31, 1948, defendant's evidence showed that total revenues from operations amounted to something more than three million dollars, roughly divided as follows: From carriage of persons and property on certificated lines $511,000; from carriage of mail $525,000, including a payment of $337,000 of which defendant received information for the first time during the trial of the case; from all other operations, including those admittedly of common carrier nature, the BJL service and other "contract" and charter service $2,156,000. The defendant's expenses during the same period totaled approximately $37,000 less than its revenues. All of these figures were furnished by defendant during trial of the case but they are obviously in some small degree erroneous because the totals as stated in the testimony vary slightly from the actual totals of the individual amounts given. No clear showing was made that the defendant's non-certificated operations were profitable. An inference may be drawn to the contrary from the fact that the figures as at first given in the testimony showed a loss of approximately $300,000, which was later made up, with a surplus, by the increase in air mail pay, amounting to $337,000, given for services on defendant's certificated routes.

In December, 1947, the Civil Aeronautics Board, conceiving the transportation of persons by the defendant between Seattle and Alaska to be unlawful, under the provisions of the Act and under Regulation 292.2, issued a show cause order. The defendant responded. The Board on January 2, 1948, made a Cease and Desist

Order, consented to by defendant, forbidding the defendant to transport persons between the Seattle area and Alaska and expressly limiting the defendant in the transportation of persons between any other point in the States and Alaska. The relevant portions of the Order are quoted below:

"It is ordered:

"1. That Alaska Airlines, Inc., cease and desist from engaging in the air transportation of persons on a common carrier basis as follows:

"(a) That, unless and until appropriately authorized by the Board to do so in any order, regulation, or other suitable action, Alaska Airlines, Inc., cease and desist from engaging in the transportation by air of persons on a common carrier basis

"(1) between Anchorage, Alaska and Seattle, Washington and between Fairbanks, Alaska and Seattle, Washington; and

"(2) between any point or points in Alaska and any point or points in the Continental United States (excluding the operations covered by the foregoing sub-paragraph (1)), except for charter trips and other special services in conformity with Section 292.2 of the Board's Economic Regulations, which shall not exceed seven or eight trips per month between any two points, and if operated shall be operated at such varying intervals as to avoid any implication of regular or scheduled service.

"(b) That, during the pendency of this proceeding and for so long as this Order shall remain in effect, Alaska Airlines, Inc., cease and desist from engaging in any transportation by air of persons, which transportation may be contended by Alaska Airlines, Inc. not to constitute common carriage, between Anchorage, Alaska or Fairbanks, Alaska or either thereof and Seattle, Washington or Portland, Oregon or any place within a one hundred mile radius of either Seattle, Washington or Portland, Oregon, unless on or before 30 days prior to the date upon which such transportation is to commence, Alaska Airlines, Inc., shall have made and filed a complete written report to the Board concerning all circumstances, details and nature of arrangements regarding the proposed transportation together with a copy of any written agreement governing such transportation, or if no such agreement has been executed, a memorandum setting forth all terms, conditions, undertakings and responsibilities to be involved in such transportation.

"(c) That, unless and until otherwise authorized by the Board, Alaska Airlines, Inc., cease and desist from advertising directly or otherwise, or in any other manner representing to the public directly or otherwise, or allowing the public to believe or understand

"(1) that Alaska Airlines, Inc., engages in the air transportation of persons, between any point or points in Alaska and any point or points in the Continental United States, with any frequent or regular service involving repeated flights to and from the same points;

"(2) that Alaska Airlines, Inc., without effective qualifications or limitations as to frequency and regularity engages in the air transportation of persons between any point or points in Alaska and any point or points in the Continental United States;

"(3) that the services of Alaska Airlines, Inc., in the air transportation of persons are customarily, frequently, or regularly available between any point or points in Alaska and any point or points in the Continental United States; and

"(4) that the services of Alaska Airlines, Inc., in the air transportation of persons are available between any point or points in Alaska and any point or points in the Continental United States unless affirmatively disclosing in an effective manner that flights between such points are operated only upon a casual, occasional, and infrequent basis.

"(d) That, unless and until otherwise authorized by the Board, Alaska Airlines, Inc., cease and desist from operating flights of aircraft in the air transportation of persons, other than as provided in the foregoing subparagraph (a) of Paragraph 1 of this Order.

"(1) In such manner that any given or uniform number of flights are operated between any point or points in Alaska and any point or points in the Continental United States per week or recurrently in successive weeks;

"(2) between any point or points in Alaska and any point or points in the Continental United States, regularly or with a reasonable degree of regularity, which regularity within the meaning hereof is reflected by the operation of a single flight per week on the same day of each week between the same two points, or is reflected by the recurrence of operations of two round trip flights, or flights varying from two or three or more of such flights between any same two points, each week in succeeding weeks, without there intervening other weeks or approximately similar periods at irregular but frequent intervals during which no such flights are operated so as thereby to result in appreciable definite breaks in service; it being intended by this sub-paragraph to require irregularity of service between any such points but not to preclude the operation of one or two such flights in any given week, nor to prescribe any specific maximum limitations upon the number of flights which may be performed in any one week, if infrequency and irregularity of service is otherwise achieved through variations in numbers of flights and intervals between flights and through frequent and extended definite breaks in service; and

"(3) between any point or points in Alaska and any point or points in the Continental United States otherwise than upon a casual, occasional and infrequent basis, made in such manner as to avoid the result of establishing a regular or scheduled service."

Since January 3, 1948, the defendant's advertisements have usually embraced statements to the effect that the service offered was not regular or scheduled, and that the flights were casual, occasional or infrequent.

Since the Cease and Desist Order was made, the defendant has operated what it has advertised as "infrequent non-sched-uled" flights between Anchorage and Great Falls, Minneapolis and Chicago. Four such round trip flights were made in January, 1948, three in February, four in March, five in April and five in May. Copy of the text of defendant's typical advertisement for these flights follows:

Now You Can
Afford That Trip
You've Been
Planning So Long

Alaska
Airlines

Announces
Infrequent Non-Scheduled
Flights to

Great Falls—Minneapolis
Chicago and
San Francisco

Call

Main 52
53

Until 6 P.M.
Thereafter
Main 256
For Fares and
Information

Alaska Airlines
Anchorage, Alaska

That in operating the flights between Anchorage and Great Falls, Minneapolis and Chicago, the defendant acted as a common carrier is too obvious to admit of rational argument. The defendant accommodated all who applied to the capacity of its planes. Of course, in this instance also, the defendant materially undercut Northwest's standard charges for similar services as to air transportation between Anchorage and Minneapolis and Chicago which are on one of Northwest's certificated routes.

Before taking up the other questions of law involved, the preliminary one as to the nature of certain of the operations of the defendant on non-certificated routes should first be considered.

Remembering that in the absence of statute only two types of carriage are recognized, the one private carriage and the other common carriage, it is necessary to determine the nature of the plaintiff's

operations as respects the BJL work and other flights which the defendant has listed as being of a "contract" type. The orthodox concept of common carrier is that of one who holds himself out as ready, able and willing, for hire, to undertake the transportation of persons or property, or both, from place to place invites the patronage of the public, and engages in such transportation as a business.

The defendant did admittedly operate as a common carrier in the transportation of both persons and property between Seattle and Anchorage, until January 3, 1948, so the question is whether a consistently operating common carrier, under the circumstances presented here, was engaged as a private carrier for a considerable amount of its work as a carrier over its common carrier routes.

That a common carrier may at times and for certain operations become a private carrier is not open to dispute. The following is quoted from the text of 9 Am.Jur. p. 436, Sec. 12, on Carriers:

"A common carrier may undoubtedly become a private carrier, or a bailee for hire, when as a matter of accommodation or special engagement he undertakes to carry something which it is not his business to carry."

The text statement above quoted is fully sustained in the following cases: Railroad Company v. Lockwood, 1873, 17 Wall. 357, 84 U.S. 357, 377, 21 L.Ed. 627; Chicago, M. and St. P. R. Co. v. Wallace, 7th Cir., 1895, 66 F. 506, 511; Robertson v. Old Colony R. Co., 1892, 156 Mass. 525, 31 N.E. 650; Coup v. Wabash St. L. & P. Ry. Co., 1885, 56 Mich. 111, 22 N.W. 215.

But in the case of Railroad Company v. Lockwood, supra, the Court in its opinion went on to make the following observation:

"But when a carrier has a regularly established business for carrying all or certain articles, and especially if that carrier be a corporation created for the purpose of the carrying trade, and the carriage of the articles is embraced within the scope of its chartered powers, it is a common carrier, and a special contract upon its responsibility does not divest it of the character." 17 Wall. page 377.

Some of the features of the BJL operations, standing alone, would indicate private rather than common carriage. But in reality and considered in its entirety, the carriage for BJL was an integral part of the concededly common carriage operations of the defendant, and the whole of the BJL operations taken in connection with all of the other operations of the defendant over the same routes must be classed as common carrier work. While the defendant made a contract or contracts for the carriage, the price that was agreed upon was roughly comparable to defendant's ordinary rates for other common carriage between the same points, and the defendant at all times held itself out to the world as a common carrier over the routes.

The nature of the carriage of goods where the carrier claimed to have operated under contract and not as a common carrier, under circumstances similar to those respecting the BJL in the instant case, was considered in the case of Alaska Air Transport, Inc., v. Alaska Airplane Charter Co., D.C., 72 F.Supp. 609. The Court there held, upon abundant authority cited in the opinion, that the making of a separate contract by the carrier with each shipper, to undertake the transportation of persons and property up to the limit of its capacity, did not remove the operation from common carrier status.

The various provisions of the governing statutory law and regulations which bear upon the facts in this case may now be considered. Immediately below are quoted certain provisions of the Civil Aeronautics Act of 1938, as amended, Title 49, Sections 401 to 682 inclusive, U.S.C.A., and of the Regulations made thereunder: First, the applicable definitions found in Section 1 of the Act, Title 49, Section 401, U.S.C.A.; thereafter the relevant provisions of Section 401, sub-paragraphs (a) and (f) of the Act, Section 481, U.S.C.A., concerning the issuance of certificates of public convenience and necessity; Section 416 of the Act, Section 496, U.S.C.A., relative to the classification and exemption of air carriers; then

Section 1007 of the Act, Section 647, U.S. C.A., relating to judicial enforcement; and finally the applicable portions of Section 292.2 of the Economic Regulations of the Board both before and after December 1, 1947.

"Title I * * * Section 1. * * *

"(2) 'Air carrier' means any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation: * * *

"(10) 'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft. * * *

"(20) * * * 'overseas air commerce', * * * mean the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft, or the operation or navigation of aircraft in the conduct or furtherance of a business or vocation, in commerce between, * * *

"(21) * * *

"(b) a place in any State of the United States, or the District of Columbia, and any place in a Territory or possession of the United States; or between a place in a Territory or possession of the United States, and a place in any other Territory or possession of the United States; * * * "

"Sec. 401. (a) No air carrier shall engage in any air transportation unless there is in force a certificate issued by the Board authorizing such air carrier to engage in such transportation: * * *

"(f) * * * Any air carrier may make charter trips or perform any other special service, without regard to the points named in its certificate, under regulations prescribed by the Board."

"Sec. 416. (a) The Board may from time to time establish such just and reasonable classifications or groups of air carriers for the purposes of this title as the nature of the services performed by such air carriers shall require; and such just and reasonable rules, and regulations, pursuant to and consistent with the provisions of this title, to be observed by each such class or group, as the Board finds necessary in the public interest.

"(b) (1) The Board, from time to time and to the extent necessary may (except as provided in paragraph (2) of this subsection) exempt from the requirements of this title or any provision thereof, or any rule, regulation, term, condition, or limitation prescribed thereunder, any air carrier or class of air carriers, if it finds that the enforcement of this title or such provision, or such rule, regulation, term, condition, or limitation is or would be an undue burden on such air carrier or class of air carriers by reason of the limited extent of, or unusual circumstances affecting, the operations of such air carrier or class of air carriers and is not in the public interest."

"Sec. 1007. (a) If any person violates any provision of this Act, or any rule, regulation, requirement, or order thereunder, or any term, condition, or limitation of any certificate or permit issued under this Act, the Board, its duly authorized agent, or, in the case of a violation of section 401(a) of this Act, any party in interest, may apply to the district court of the United States, for any district wherein such person carries on his business or wherein the violation occurred, for the enforcement of such provision of this Act, or of such rule, regulation, requirement, order, term, condition, or limitation; and such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining such person, his officers, agents, employees, and representatives, from further violation of such provision of this Act or of such rule, regulation, requirement, order, term, condition, or limitation, and enjoining upon them obedience thereto."

Prior to December 1, 1947, the relevant governing provisions of Section 292.2 were as follows:

"Sec. 292.2 Alaskan air carriers—(a) Classification of air carriers. There is hereby established, within the meaning of section 416(a) of the Civil Aeronautics Act of 1938, a classification of air carriers which, except as otherwise authorized in paragraph (d) of this section, engage solely in air transportation within the Territory of Alaska, said classification to be designated as 'Alaskan Air Carriers'."

* * * * * *

"(d) Charter trips and other special services. Every Alaskan air carrier may make charter trips and render other special services between points on routes which it is authorized by its certificate to serve. Charter trips and other special services may also be rendered to or from any other point within or outside the Territory of Alaska: Provided, That such trips originate at or are destined to a point on a route (regular or irregular) the carrier is authorized by its certificate to serve; And provided further, that all such trips are casual, occasional or infrequent, and are not made in such manner as to result in establishing a regular or scheduled service. * * *"
C.F.R.1946 Supp. p. 2175; C.F.R.Cum. Supp. Book 3, p. 4006.

After December 1, 1947:

"Sec. 292.2 Alaskan Air Carriers

"(a) Classification of Air Carriers. There is hereby established, within the meaning of section 416(a) of the Civil Aeronautics Act of 1938, a classification of air carriers which, except as otherwise authorized in subparagraph (b) (2) and subdivision (c) (1) (ii) of this section, engage solely in air transportation within the Territory of Alaska, said classification to be designated as 'Alaskan Carriers'. Such Classification shall include both (1) certificate air carriers and (2) air carriers operating under the authority of paragraph (c).

"(b) Temporary Exemption of Certificated Air Carriers. Until the Board shall adopt further rules, regulations, or orders, any Alaskan Air Carrier which holds a certificate of public convenience and necessity issued by the Board shall be exempt, subject to the conditions and requirements hereinafter set forth, from sections 401(a) and 404(a) of the Act insofar as the enforcement of said sections would prevent any such air carrier:

"(1) from providing, over a regular route designated in a certificate of public convenience and necessity, service, of the same type authorized by the certificate, to such additional points not named in the certificate as are situated within the territory which would ordinarily be served by such route.

"(2) from making charter trips and rendering other special services between points on routes which it is authorized by its certificate to serve. Charter trips and other special services may also be rendered to or from any other point within or outside the Territory of Alaska; Provided, however, That such trips originate at or are destined to a point on a route (regular or irregular) the carrier is authorized by its certificate to serve; and, Provided, further, That all such trips are casual, occasional, or infrequent, and are not made in such manner as to result in establishing a regular or scheduled service."

■■ In the light of the definitions it is apparent that "air transportation" as used in Section 401 of the Act means the carriage by aircraft in commerce of persons or property *as a common carrier* for compensation or hire, or the carriage of mail by aircraft. It is equally clear that the presently applicable provisions of Section 401(a) and (f) may be considered and applied to the facts in the case as if the text thereof were stated in the following words:

No citizen of the United States shall engage in the carriage by aircraft of persons or property as a common carrier for compensation or hire in commerce between the United States and Alaska, unless there is in force a certificate issued by the Civil Aeronautics Board authorizing such citizen to engage in such transportation. * * * Such citizen may make charter trips or perform any other special service without regard to the point named in the certificate under regulations prescribed by the Board.

■ It is, therefore, evident that under Section 401 of the Act a common carrier is required to hold a certificate, unless exempted under the authority given to the Board in Section 416(b) (1), but that a certificate holder, under Section 401(f) of the Act, "may make charter trips or perform any other special service, without regard to the points named in its certificate, under regulations prescribed by the Board," which may be regarded as a quasi exemption in itself, or, better, an expressly de-

clared right granted, not by action of the Board, but by law. In view of the language used, it would appear that the Board may regulate, but not proscribe, the "charter trips" and "any other special service" mentioned in 401(f).

■ Counsel for all of the parties agree that the "charter trips" and "other special service" mentioned in Section 401(f) embrace only common carriage operations, no matter how the individual words or terms might otherwise be defined. That view must be adopted by the court.

■ As shown in the excerpts of the Act above quoted, Section 401(a) does not contain all of the law relating to the requirement of certificates by air carriers, because under Section 416 the Board may classify carriers and may exempt carriers from the restrictions of 401(a); and the Board has made and promulgated its Regulation 292.2 creating the class of Alaska Air Carriers and making provisions for air carriage by those embraced within that class. Now reviewing 292.2(b) (2), it would seem that the meaning thereof, as applied to the facts in this case, may be stated in the following language:

Every Alaska air carrier shall be exempt from Section 401(a) of the Act insofar as the enforcement of said section would prevent any such air carrier from making charter trips or rendering other special services to or from any point within or outside the Territory of Alaska; provided, that all such trips are casual, occasional or infrequent, and are not made in such manner as to result in establishing a regular or scheduled service.

It is further evident that the "charter trips" and "other special service" provided for in 401(f) are identical in meaning with and actually refer to the "charter trips" and "other special services" mentioned in 292.2(b) (2). The conclusion is inescapable that the Board in performance of its duty in providing regulations under the last sentence of 401(f) fulfilled that duty, according to its judgment at that time, as to Alaskan Air Carriers by and through 292.2, in view of the fact that the last sentence of 401(f) establishes a statutory right for the enjoyment of which no administrative *exemption* is necessary. Hence, the use of the word "exempt" in 292.2 may seem out of place as to 292.2(b) (2). But it is clear upon a consideration of the whole body of 292.2, that the matter contained in subsection (b) (1) thereof is a legitimate subject of an exemption, and therefore the word "exempt" is rightly used even if that word has no necessary application to subdivision (b) (2) of 292.2. Considering 292.2 as an entirety, and giving due weight to the word "insofar" as applied to 292.2(b) (2), it seems clear that the operations of an Alaska Air Carrier under 292.2 may embrace only (a) charter trips and (b) any other special services; that the charter trips or other special services must in addition be so made as to be "casual, occasional or infrequent"; and, further, that they may not be made in such manner "as to result in establishing a regular or scheduled service." This is indeed a combination of restraints.

Coming now to the further restrictions of operations under 292.2, we see that the flights must be casual, occasional or infrequent. The use of the three words and of the disjunctive "or" is not entirely clear. Webster's International Dictionary tells us that the word "casual," among other things, may mean "coming without regularity; occasional; incidental; as casual expenses"; that the word "occasional" may mean "occurring at irregular intervals; infrequent"; that a synonym of "occasional" is "infrequent"; that among the antonyms of the word are "habitual," "customary," "constant." Among the definitions of the word "infrequent" as therein given are the following: "Seldom happening or occurring; rare; uncommon; placed or occurring at considerable distance or intervals; occasional; far; as infrequent openings in a wall; infrequent lapses in conversation."

■ It will be seen from the definition that although the carrier apparently has the choice under 292.2 of making his non-certificated operations casual, *or* occasional, *or* infrequent, the choice must be made within a tightly enclosed area because the words themselves as applied to air carriage:

are almost synonymous even though each of the words is without any fixed and absolute meaning which must be assigned to it under any and every circumstance; and it must be considered that under 292.2 the casual, occasional or infrequent flights so made may not be made "in such manner as to result in establishing a regular or scheduled service." Of the three words, it would seem that the word "infrequent" is the least restrictive because it must necessarily relate to some other norm, or standard, or circumstance, even though a temporary one.

■ The issue arising from defendant's operations as regards the transportation of passengers between Seattle, Washington, and the vicinity thereof, and Alaska has been settled by the Cease and Desist Order of the Board forbidding all carriage of passengers, and since January 3, 1948, or thereabouts the defendant has carried no passengers between the area mentioned and Alaska. After that time, however, the proof shows that the defendant has carried a considerable number of passengers between its terminals in Alaska and the cities of Great Falls, Minneapolis, and Chicago. These flights have not exceeded in number those limited by the Board in its Cease and Desist Order of January 3, 1948. Plaintiff and intervenors insist, however, that the planning of these flights and the nature thereof and the circumstances under which they are made constitute a regular pattern and are not either casual, occasional or infrequent within the meaning of 292.2 and, therefore, that the Order is being violated and that there is consequently a violation of Section 401(a). However, it is within the power of the Board to grant exemptions from the provisions of Section 401(a) and it must be assumed in this Court that the Board acted within its authority in making the Order and that unless there is a plain and substantial violation of the provisions of that Order this Court in this action should not interfere. The defendant's air transportation operations between Alaska and Great Falls, Minneapolis and Chicago, have not been on such a massive scale as to invoke the authority or demand the intervention of the Court. The Board, if it be deemed desirable, may announce a more careful definition of its will than is contained presently in the Order.

■ But conditions with respect to operations of defendant as regards the carriage of freight between the Seattle area and Alaska are on a different basis. The records of the defendant show that during the month of May, 1948, defendant's planes made 39 flights between the Seattle area and Anchorage, in each, except for seven ferry flights, carrying various quantities of freight. So far as shown by the proof all of these flights were made by the defendant in its capacity as a common carrier. Under no discernible theory of the law can these operations be considered as anything except common carriage. They may not rightly be deemed special services under Section 401(f) of the Act or under 292.2 of the Regulations. Neither, considering all the circumstances, can such flights be deemed either casual, or occasional, or infrequent. The defendant evidently carried all of the freight that has been offered to it by anyone willing to pay the charges made for such transportation.

The defendant asserts that its freight carrying operations between the States and Alaska have never been specifically challenged by the Board, although the Board has been always aware of the nature and extent of such operations. Admitted in evidence is a paper known as "Economic Regulations Draft Release No. 24", dated November 20, 1947, issued by the Board, proposing exemption of cargo carriers operating between Alaska and the States, upon the theory that further service is needed. That proposed regulation was never adopted, and, in fact, on March 5, 1948, Board announced that it would not adopt Draft Release No. 24.

Although not directly affecting any of the issues in this action, it has been shown that Regulation 292.1 of the Economic Regulations of the Board, adopted on May 5, 1947, and effective June 10, 1947, provides for a class of what is known as "irregular air carriers" excerpts from which are quoted below:

"(a) Applicability.—This section shall not apply to any air carrier authorized by

a certificate of public convenience and necessity to engage in air transportation, to Alaskan Air Carriers, to operations within Alaska, or to any non-certificated air carrier engaged in air transportation pursuant to special or individual exemption by the Board or pursuant to the exemption created by any other section of the Economic Regulations.

"(b) Classification.—There is hereby established a classification of non-certified air carriers to be designated as "Irregular Air Carriers". An Irregular Air Carrier shall be defined to mean any air carrier (1) which does not hold a certificate of public convenience and necessity under section 401 of the Civil Aeronautics Act of 1938, as amended, (2) which directly engages in interstate or overseas air transportation of persons and property or foreign air transportation of property only, and (3) which does not hold out to the public, expressly or by a course of conduct, that it operates one or more aircraft between designated points, or within a designated point, regularly or with a reasonable degree of regularity upon which aircraft it accepts for transportation, for compensation or hire, such members of the public as apply therefor or such property as the public offers. No air carrier shall be deemed to be an Irregular Air Carrier unless the air transportation services offered and performed by it are of such infrequency as to preclude an implication of a uniform pattern or normal consistency of operation between, or within, such designated points. Within the meaning of this definition a "point" shall mean any airport or place where aircraft may be landed or taken off, including the area with a 25-mile radius of such airport or place."

From the above quoted provisions of 292.1 it will be observed that an extensive field for air transportation between the States and Alaska is opened to the class of "irregular air carriers" therein mentioned. Common knowledge tells us that the authority of 292.1 has been availed of to a considerable extent. Why the same privileges in identical or similar language were not accorded to the class of Alaskan Air Carriers set up by 292.2 does not readily

appear and may be irrelevant. Perhaps it was intended by the Board that 292.1 should be the equivalent of 292.2, and that view is sustained by a press release issued by the Board under date of July 16, 1946, which reads as follows:

"Civil Aeronautics Board
"Washington, D. C.
"For Release:
"Immediate
"July 16, 1946

"The Civil Aeronautics Board announced today that Alaskan air carriers may engage in charter trips and other special services to or from points within or outside Alaska.

"The order was issued in the form of an Amendment to Section 292.2 of the Economic Regulations. The original Regulation, issued on October 22, 1942, established a special classification known as 'Alaskan Air Carriers' who are entitled to certain exemptions from the Economic Regulations not available to certificated domestic carriers. The 1942 order was issued pursuant to Section 416 of the Civil Aeronautics Act of 1938, which authorized the Board to 'from time to time established such just and reasonable classifications or groups of air carriers as the nature of the services performed by such air carriers shall require * * *.'

"Section 292.2 is now amended so as to amplify the authorized operations of Alaskan carriers so that those carriers may now engage in charter trips and other types of special service within or outside the Territory. This will enable them to fly charter and nonscheduled operations between the Territory of Alaska and points in the United States. It should be noted, however, that such trips must originate at or be destined for a point on the route which the carrier is authorized by its certificates to serve. For instance, an Alaskan carrier certificated to serve Anchorage may now fly charter trips from that city to the United States, and trips originating in the United States may be flown to that city.

"The Board indicated that it took this action to place Alaskan carriers on a parity with United States carriers so far as

nonscheduled and charter operations are concerned."

However a careful scrutiny and comparison of the language used in the two regulations, namely, 292.1 and 292.2, may lead to a contrary conclusion. In any event the defendant in this action is bound by provisions of 292.2 and can not rely upon what may possibly be considered the broader scope of activity authorized by 292.1.

Upon cross examination, when asked to explain or justify some act, the defendant's witness and general manager, James A. Wooten, testified that former Board Chairman James M. Landis once stated to him that the defendant's operations then being conducted on an even larger scale than at the present time were fully authorized by 292.2. That testimony was not denied. But such a declaration, even if made by a member of the Board, is not binding on the Board and certainly cannot influence the decision of the Court.

The defendant suggests that the "casual, occasional and infrequent" restrictive conditions on the traffic permitted by 292.2 should be measured by the volume of traffic available and that the traffic actually secured by defendant was lost to the steamship carriers and not to the certificated airlines with their higher tariff rates on both passengers and property. As to the first, the adoption of the defendant's theory would completely nullify the term "casual, occasional or infrequent." As to the second, the assertion is based upon the opinion of defendant's witness and not sustained by any conclusive evidence. Both must be accordingly rejected.

The defendant urges that the Court is without jurisdiction to entertain the action or to grant any of the relief prayed for. While that contention was rejected in the preliminary motion, it has never been waived, indeed, it cannot be waived because the question of jurisdiction is involved and must be again carefully considered now that the proof is in. That contention is based upon the judicial enforcement provisions of the Act to be found in Section 1007, the relevant portion of which is quoted above.

Upon the questions of jurisdiction the first point to be determined is whether the plaintiff and intervenors are parties in interest under Section 1007(a). That they are such parties in interest appears from what already has been said. The proof is abundant to sustain their claim that they have been and are being competitively damaged by the defendant's operations. If those operations were and are unlawful, the plaintiff and the two other air carriers intervening are entitled to relief, provided always that the Court can give it. Western Pacific California Railroad Co. v. Southern Pacific Co., 284 U.S. 47, 52 S.Ct. 56, 76 L.Ed. 160; Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808.

Whether the Court is authorized to give such relief is more debatable. This Court has no authority to act unless there has been a violation of Section 401(a) of the Act. The defendant says that Section 401(a) of the Act has not been violated because the defendant has operated under the exemption which the Board is authorized to give and which is embraced in Section 292.2, and that if the defendant has violated Section 292.2, then the Board only—and no party in interest—may bring suit against the defendant on account of such violation. That argument is not entirely without logical basis, but several sound reasons militate against it.

Under 292.2 the Alaska Air Carriers are not granted an absolute exemption from the provisions of 401(a). Such carriers are exempted only *"insofar"* as the enforcement of Section 401(a) would prevent the Alaskan air carriers from undertaking charter trips and other special services on a casual, occasional or infrequent basis. The exemption is thus sharply limited, perhaps so sharply as to make the privilege therein granted almost worthless. But in any event, the Board did not grant and has not granted any clear and complete exemption from 401(a) and, therefore, it is more logical to argue that if a carrier goes any measurable distance outside of the boundaries of the "insofar" exemption granted, that carrier is and must be in violation of 401(a).

Section 401(a) forbids all common carriage by air—regular and irregular, scheduled and non-scheduled—without a certificate. Section 416(b) (2) gives the Board authority to exempt carriers from that requirement of 401(a). A carrier so exempted is safe within the area of the exemption so long as he remains within the external boundary limits of his exemption, as within the walls of a protecting fortress; but without those walls, 401(a) still rules and its mandate must be obeyed. Hence one departing from the exempted area of operation necessarily comes within the original jurisdiction of 401(a) which says that all common carrier operations must be certificated. Common carrier operations without such certificate may be enjoined by a party in interest under 1007(a). As a defense to the charge brought under 401(a) for operating as a common carrier without a certificate, the defendant admits common carriage without certificate but says that it is exempt from 401(a), and pleads and proves the order of exemption, the conditions thereof, and defends its operations thereunder. If defendant has been so exempted and has not transgressed the conditions of its exemption, there is no violation of 401(a), but if defendant has not acted and is not acting within the exemption, it must necessarily be operating in violation of 401(a). That it is also operating in violation of the exemption order is merely conclusive proof of violation of 401(a). Actions beyond the scope of the exemption differ in no way from operations without any exemption at all.

The District Court for the District of Hawaii arrived at the same conclusion in the case of Hawaiian Airlines, Ltd., v. Trans-Pacific Airlines, Ltd., 73 F.Supp. 68, in a case wherein the less restrictive provisions of 292.1 was the authority of the carrier to engage in common carriage operations. In that case the defendant operated a regular scheduled service and claimed authority under Section 292.1, which, as observed above, may be somewhat more liberal than 292.2, but the Court nevertheless sustained the action and upon final trial granted the relief prayed for. As this is written, it is reported that the case is now on appeal to the United States Circuit Court of Appeals for the Ninth Circuit. A "sequel," as it was called, to that case appears in Trans-Pacific Airlines, Ltd., v. Inter-Island Steam Navigation Co., Ltd., D.C., 75 F.Supp. 690. In the Hawaiian case mentioned—not the "sequel"—despite the claim of defendant to be operating under 292.1, the Court permitted the certificated carrier as a party in interest to bring and maintain the suit and obtain the relief sought.

Neither the Alaska Air Transport case, supra, nor the Hawaiian Airlines case, supra, is directly and entirely in point. In the Alaskan case the defendant had neither certificate nor exemption but claimed to be acting as a private carrier on a contract basis. In the Hawaiian case it seems undisputed that the defendant was operating as a regular scheduled carrier (a) without a certificate as required by Section 401(a) of the Act and also (b) in violation of the Board's exemption embraced in 292.1.

In the instant case the defendant claims vigorously that it has not operated and does not operate a regular scheduled service. Some testimony indicated that one of the defendant's agents at one time orally stated that the company was carrying on regular daily flights between Alaska and Seattle "Monday through Friday." While this was not specifically denied, the general tenor and body of the evidence indicated that the defendant did not advertise or expressly claim that it operated a regular scheduled service. Some opinion testimony was given to the effect that a statement of the elapsed time of flight between Anchorage and Seattle indicated a scheduled service, but in view of all of the circumstances that conclusion seems unsound. However, the operations of the defendant were and are of such a nature, as to the carriage of freight between Alaska and Seattle as to be of the general pattern of regular, perhaps even scheduled, service, or its equivalent, and before January 3, 1948, the same was true as to carriage of persons. Whether the service challenged was or was not regular scheduled service would not affect jurisdiction under 1007(a). The decision on the ques-

tion of jurisdiction is that the plaintiff and intervenors are parties in interest, that Section 401(a) has been violated, and that, as a consequence, the Court has jurisdiction.

■ That part of defendant's BJL service which covered the carriage of explosives and other property not generally or ordinarily carried by air at the time, that part covering the carriage of fresh fish from Alaska to the States under contract with Col. Lawrence V. Castner, and some other kindred operations as shown by the testimony may well be classed as "special service" under 401(f); but all such services fall within the definition of common carriage when considered in connection with the predominant body of defendant's unquestioned common carrier operations.

The defendant's non-certificated operations have been for the most part neither charter flights nor other special services; nor have they been confined within the limits of "casual, occasional or infrequent." Moreover, such operations, at least until January 3, 1948—and excepting specifically the traffic between Alaska on the one hand and Great Falls, Minneapolis and Chicago on the other since January 3, 1948—have been made in such manner as to establish at times in appearance and pattern a reasonable facsimile of regular, if not scheduled, service.

■■ Counsel for defendant urges that the Board exceeded its authority in the Cease and Desist Order in forbidding the defendant to transport passengers by its airplane between Alaska and the area of Seattle, Washington. This argument is based upon the premise that the last sentence of 401(f) gives an absolute right which may not be denied under the form of regulation. The validity of that argument need not here be considered for two controlling reasons: First, the Cease and Desist Order is virtually a consent order and, therefore, the defendant is estopped to complain of it; and second, this Court is entirely without jurisdiction pronounce the Cease and Desist Order invalid in any possible application or for any purpose. If the Cease and Desist Order is invalid

in any respect and if the defendant has the legal right to complain of it, then that complaint must follow the channel prescribed in Section 1006(a) which provides that:

"Any order, affirmative or negative, issued by the Board under this Act, * * * shall be subject to review by the circuit courts of appeals of the United States or the United States Court of Appeals for the District of Columbia * * *."

■ The public benefits resulting from the operations of the defendant, the advantages flowing from its abundant capacity to carry passengers and large quantities of freight from the States to Alaska and from Alaska to the States, have been suggested in the testimony and touched upon in argument. It is urged that defendant, through exercise of the larger measure of resourcefulness and foresight, simply occupied a trade vacuum overlooked or ignored by the certificated carriers. But the decision of the Court may not be swayed by such considerations. The Board alone is charged with the duty of "the promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices" and the development of "competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense." Sec. 2(c, d) of the Act. The Board is in best position to discern, and the Board alone has authority to determine in the first instance whether the activities of defendant are an example of destructive competition, or whether it is competition necessary to assure the sound development of an air transportation system properly adapted to the needs of foreign and domestic commerce. If what the defendant has done lies in the latter class of competitive practice, the Board has the means of knowledge to so conclude, and the power to so declare by suitable regulatory orders. Facilities adequate in scope to obtain the necessary factual knowledge of the subject

610

matter and authority to command in what is essentially an administrative and not a judicial function are both lacking to the Court.

Full consideration has been given to the arguments of counsel for the defendant on the doctrine of primary jurisdiction illustrated in Texas and Pacific Railway Company v. Abilene Cotton Oil Company, 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075, which would deny to the Court the authority to grant any relief to the plaintiff and intervenors in this action. But the language used in the Act appears to command the contrary result. The circumstantial detail with which the Act was written requires the conclusion that if Congress had desired the Courts not to intervene in circumstances such as have been presented in this case, appropriate language would have been used to that end. The Act which controls here was enacted by a Congress which must have had ample knowledge of the doctrine mentioned. Evidently the same conclusion was arrived at in the Hawaiian Airlines case hereinbefore cited. That view is not shaken by the decisions given in Adler v. Chicago & Southern Air Lines, Inc., D.C.Mo. 1941, 41 F.Supp. 366, and other similar cases, which rightly uphold the primary jurisdiction doctrine on the facts there disclosed.

The defendant may be permanently enjoined from carrying on overseas air transportation otherwise than as permitted by the Civil Aeronautics Board.