**LAS VEGAS HACIENDA, INC. and Henry F. Price, Petitioners,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

**No. 17081.**

United States Court of Appeals Ninth Circuit.

Jan. 16, 1962.

Rehearing Denied Feb. 23, 1962.

Flint & Mackay, John W. Preston, Jr., Robert E. Willard, Los Angeles, Cal., for petitioner.

Lee Loevinger, Asst. Atty. Gen., Richard A. Solomon, Attorney, Dept. of Justice, John H. Wanner, General Counsel, C. A. B., Joseph B. Goldman, Deputy General Counsel, O. D. Ozment, Asso. General Counsel, Litigation and Research, Robert L. Toomey, Attorney, C. A. B., Washington, D. C., for respondent.

Before MERRILL and BROWNING, Circuit Judges, and JAMES M. CARTER, District Judge.

BROWNING, Circuit Judge.

Las Vegas Hacienda, Inc. operates a resort hotel at Las Vegas, Nevada. Over a period of years it has advertised and sold in the Los Angeles area a "package tour" which includes a "free" airplane ride to and from Las Vegas. The transportation is provided in planes owned by Hacienda and operated by its employees through its "Flight Division," managed by Henry F. Price. The Civil Aeronautics Board has held that Hacienda and Price are engaged in "the carriage by aircraft of persons or property as a common carrier for compensation or hire" in interstate commerce without the certificate of public convenience and necessity required by the Federal Aviation Act, and has ordered them to cease and desist.

Petitioners challenge both the Board's power to issue the order, and the form in which the order is cast. As to the Board's power, they argue that they are not subject to economic regulation under the Act because the transportation they provide is merely incidental to their resort hotel business. As to form, they argue that the Board's order is so vague and general that it fails to give fair notice of the conduct which it prohibits. We conclude that the Board's classification of Hacienda as a "common carrier for compensation or hire" required to be certificated is supported by substantial evidence and soundly based in law, and that the Board's cease and desist order provides fair notice of what it prohibits when read in the light of the Board's opinion. We further conclude that the record does not contain substantial evidence to support the Board's order with respect to Price. This portion of the Board's order is stricken, and the Board's order is otherwise affirmed.

I

The Federal Aviation Act [1] provides for broad economic regulation [2] of "air transportation." [3] The Civil Aeronautics Board is under an affirmative statutory duty to exercise its regulatory powers over "air transportation" so as to foster sound economic conditions, promote economical and efficient service at reasonable charges, and avoid destructive compe-

1. The Federal Aviation Act of 1958, 72 Stat. 731, 49 U.S.C.A. § 1301 et seq., is, for purposes of this case, a recodification of the Civil Aeronautics Act of 1938, 52 Stat. 973. The two Acts are referred to interchangeably in this opinion as "the Act."

2. Entry into the business of air transportation is controlled by the Board through the issuance of certificates of convenience and necessity (49 U.S.C.A. § 1371); air carriers are required to establish, file, and adhere to tariffs reflecting reasonable and non-discriminatory rates, regulations, and practices (49 U.S. C.A. §§ 1373, 1374); the Board may

suspend unjust or unreasonable rates or practices and prescribe lawful ones (49 U.S.C.A. § 1482); the Board may prescribe industry accounting practices and require reports (49 U.S.C.A. § 1377); the Board must approve mergers, acquisitions, and certain interlocking relationships (49 U.S.C.A. § 1378).

3. Thus Section 401(a) of the Act (49 U.S. C.A. § 1371(a)), with which this proceeding is directly concerned, states that no air carrier shall engage in "air transportation" without a certificate of public convenience and necessity issued by the Board.

titive practices.[4] The legislative history of the Act emphasizes the importance attached by the Congress to the achievement of these purposes.[5] Obviously the economic regulation contemplated by the statute can be effective only if the commercial activity to which it is made applicable—"air transportation"—represents a reasonably discrete market in practical business terms. The proper interpretation of this statutory term is therefore of crucial importance in the administration of the Act.

So far as here pertinent, the term "air transportation" is ultimately defined by the Act as "carriage by aircraft of persons or property as a common carrier for compensation or hire * * *."[6] The term "common carrier," which is central in this statutory definition of "air transportation," is an ancient one in our law and has been applied in many legal and factual contexts. It is not surprising that the numerous decisions defining the term are somewhat less than harmonious. The fact is that these precedents leave a considerable area of choice which the Board necessarily exercises in applying the broad definition of the statute to particular carriers to determine whether they are subject to regulation.

■■ Whether the Board has chosen correctly in any given instance is, of course, subject to review by this court, for "[a]n agency may not finally decide the limits of its statutory power. That is a judicial function." Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). It is equally clear, however, that the Board's

---

4. 49 U.S.C.A. § 1302 reads in part:
    "In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:
    *     *     *     *     *
    "(b) The regulation of air transportation in such manner as to * * * foster sound economic conditions in, such transportation * * *
    "(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;
    "(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense."

5. H.R.Report No. 2254, 75th Congress, 3d Sess., after describing conditions in the industry, states (p. 2):
    "The result of this chaotic situation of the air carriers has been to shake the faith of the investing public in their financial stability and to prevent the flow of funds into the industry. Col. Edgar S. Gorrell, president of the Air Transport Association, representing substantially all of the scheduled American-flag air lines, testified before your committee during the public hearings on H.R. 9738 that $120,-000,000 of private capital has been invest-

ed in the present air-transport system and that 50 percent of this investment has been lost. He further testified that unless legislation is enacted which would give the carriers reasonable assurance of the permanency of their operation and would protect them from cutthroat competition, a number of the air lines would soon be in serious financial trouble.
    "H.R. 9738 would prohibit any person from operating as a common carrier by aircraft unless such person holds a certificate of convenience and necessity, and provides that the rates, regulations, and practices of such air carriers shall be subject to regulation. Thus, if this legislation is enacted, the air carriers will be able to operate on a stable basis, their routes secured by a certificate of convenience and necessity, which may be revoked only for cause, and their rates regulated so as to eliminate cutthroat competition among themselves. * * * Provision is also made for requiring air carriers to cease and desist from engaging in unfair competition and unfair or deceptive practices."

6. 49 U.S.C.A. § 1301(10) reads:
    " 'Air transportation' means interstate * * * air transportation or the transportation of mail by aircraft."
    49 U.S.C.A. § 1301(21) reads:
    " 'Interstate air transportation', * * * mean[s] the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft * * *" in interstate commerce.

decisions in these cases involve the application of technical knowledge which the Board, and not the court, is presumed to have. We understand that in these circumstances we are to affirm the Board's action if it has " 'warrant in the record' and a reasonable basis in law." N. L. R. B. v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). And see N. L. R. B. v. Coca-Cola Bottling Co., 350 U.S. 264, 269, 76 S.Ct. 383, 100 L.Ed. 285 (1956); Swift & Co. v. United States, 316 U.S. 216, 224–225, 62 S.Ct. 948, 86 L.Ed. 1391 (1942); Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 184–185, 59 S.Ct. 160, 83 L.Ed. 111 (1938).

■ The Board centered its inquiry in the present case upon whether the alleged common carrier was engaged as a regular business in offering air transportation to the general public in the commercial market. The Board has taken the same approach in other cases.[7] This general emphasis is justified by the common law precedents, for the dominant factor in fixing common carrier status at common law is the presence of a "holding out" to transport the property or person of any member of the public who might choose to employ the proffered service. State of Washington ex rel. Stimson Lumber Co. v. Kuykendall, 275 U.S. 207, 211–212, 48 S.Ct. 41, 72 L.Ed. 241 (1927). The test which the Board applies is an objective one, relying upon what the carrier actually does rather than upon the label which the carrier attaches to its activity or the purpose which motivates it.[8] So long as the air carrier is competing commercially in the market for the patronage of the general public, the Board holds that it is immaterial that the service offered will be attractive only to a limited group;[9] or that it may be performed pursuant to special contract.[10] And it is also immaterial that in terms of the carrier's own bookkeeping the transportation may be furnished at cost,[11] at a loss,[12] or even without charge.[13] The Board thus interprets the Act in a way which makes effective economic regulation under the statute possible by bringing within the regulatory scheme all those who compete in the commercial market in the business of offering air transportation to the public generally.

In the present case the record shows that over a period of years the petitioners have conducted regularly scheduled passenger flights from the Los Angeles area to Las Vegas. The flights were conducted in planes owned by Hacienda,

7. Consolidated Flower Shipments, Inc., 16 C.A.B. 804, 814–815 (1953), affirmed Consolidated Flower Shipments, Inc., v. Civil Aeronautics Board, 213 F.2d 814 (9 Cir. 1954), and cases cited, particularly Transocean Air Lines Inc., 11 C.A.B. 350 (1950).

8. Alaska Air Transport, Inc. v. Alaska Airplane Charter Co., 72 F.Supp. 609, 611 (D.Alaska 1947). See also United States v. State of California, 297 U.S. 175, 181, 56 S.Ct. 421, 80 L.Ed. 567 (1936).

9. Alaska Air Transport, Inc. v. Alaska Airplane Charter Co., 72 F.Supp. 609, 610–611 (D.Alaska 1947); Consolidated Flower Shipments, Inc., 16 C.A.B. 804, 815, 818 (1953), affirmed Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board, 213 F.2d 814 (9 Cir. 1954). See also Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984 (1916).

10. Pacific Northern Airlines, Inc. v. Alaska Airlines, Inc., 80 F.Supp. 592, 601 (D. Alaska 1948); Alaska Air Transport, Inc. v. Alaska Airplane Charter Co., 72 F.Supp. 609, 611 (1947); Transocean Air Lines Inc., 11 C.A.B. 350, 353 (1950); NEAL, The Status of Non-Scheduled Operations under the Civil Aeronautics Act of 1938, 11 Law & Contemp. Prob. 508, 517–518 (1946).

11. Consolidated Flower Shipments, Inc., 16 C.A.B. 804, 805, 819 (1953), affirmed Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board, 213 F.2d 814 (9 Cir. 1954).

12. Hacienda Hotels-Motels, Rooms and Flight Reservations Inc., 26 C.A.B. 372, 377 (1958).

13. Pan American Ferry Flight Case, 18 C.A.B. 214, 219 (1953).

marked with its name, and operated by uniformed Hacienda employees. They departed from regular commercial airports. Passengers received the usual air terminal services: a check-in counter, boarding passes, flight calls, and the assistance of ground attendants. The flights were sometimes identified in Hacienda's advertising as "Fiesta Flights." The package tours of which the flights were a part were advertised and sold as "Champagne Tours." Patrons were solicited from the general public in the Los Angeles area through advertisements in radio, newspapers, and brochures. These used such leaders as "Fly Free to Vegas," described the aircraft used, and set out the flight schedules. "Champagne Tours" were sold both through Hacienda's own ticket offices and through travel and tour agents who also sold tickets on other regularly scheduled passenger airlines. The price of the "Champagne Tour" was $27.50. Round trip air transportation between Las Vegas and the Los Angeles area by certified carrier was $39.20 first class, $30.50 coach. As the Examiner found, not surprisingly, "the evidence here is substantial that some people purchase the tour merely to obtain transportation." [14]

Clearly the record contained substantial support for the Board's conclusion that Hacienda was a "common carrier for compensation or hire," as the Board correctly defined that statutory phrase.

## II

Hacienda concedes that the record justifies the conclusion that it represented to the traveling public that transportation by air from the Los Angeles area to Las Vegas is available on a regularly scheduled basis by the purchase of Hacienda's "Champagne Tour." Nonetheless, Hacienda insists that it is not subject to economic regulation under the Act for a variety of reasons, all of which rest essentially upon the facts that Hacienda was primarily engaged in the resort hotel business and not the transportation business, that the furnishing of the transportation was only incidental to the promotion and operation of its resort hotel, and that it was not interested in profiting and did not profit directly from the transportation.

Petitioners advertised the transportation portion of their package tour as "free," and furnished it only as a part of a "Champagne Tour" consisting of other goods and services, the separate prices of which added up to the total price for the Tour.[15] Hacienda's books attributed no income to the sale of the transportation as such and carried the expense of it's transportation activities as part of the general operating expense of the hotel. No transportation tax was paid to the Bureau of Internal Revenue.

Hacienda argued to the Board that the transportation which it provided was entirely free and hence was not "for compensation or hire" as required to bring it within the economic coverage of the Act. However, Hacienda has disclaimed that contention in this court in apparent recognition of the obvious fact that payment for the "Tour" was payment for all that the customer received in return, including the air transportation. Indeed, in the present case the air transporta-

14. Quoting further from the Examiner's findings:

"Hacienda's board chairman conceded the possibility that many persons might purchase the tour merely to obtain low cost transportation. In addition, prospective patrons were informed by Hacienda's travel agents that non-guests were eligible to purchase the tour and one such agent reminded the patron that Hacienda's fare was less than that of the certified air carriers."

15. The other items in the "Champagne Tour" and the values assigned to them were: Transportation between the airport and the Hacienda Hotel ($1.50); use of the Hotel's golf course ($4.00); an opportunity to participate in the Hotel's hole-in-one contest ($2.00); a bottle of champagne ($12.50); a buffet dinner in the Hotel dining room ($2.50); and $5.00 for use in the Hotel's gambling casino—total $27.50, which, as noted earlier, was the total price of the "Champagne Tour," including air transportation.

tion was intended to be, and undoubtedly was, the principal inducement for the purchase of the package. The Act would be ineffective indeed if its economic regulations could be avoided simply by selling transportation only in combination with something else and calling it free. The Board was not compelled to adopt such a self-defeating construction of the statute. As we have seen, the Board's approach, and we think it was the proper one, was to look instead to the essence of petitioners' operation to determine whether it involved the area of competitive activity which the statute intended to subject to regulation—the furnishing of transportation by air to the general public on a commercial basis.[16]

The petitioners argue that if the requirement that the carriage be "for compensation or hire" is satisfied whenever the carrier realizes an ultimate economic advantage from furnishing the transportation, the limiting language is effectively read out of the statute since, as a practical matter, transportation will never be furnished wholly without hope of gain. But Hacienda did not furnish transportation for nothing more than the hope or expectation of some generalized business advantage; it imposed a direct charge upon its customers for the

transportation in combination with other goods and services. Aside from the present case, we agree that transportation will rarely be offered to the general public on a genuinely gratuitous basis, but we do not believe that this circumstance requires the Board to restrict the concept of "compensation or hire" in a way which would exclude from the economic coverage of the Act carriage offered to the public in the market on a competitive commercial basis.[17]

◼ Petitioners assert that they are not subject to economic regulation under the Act because their "Champagne Tours" are offered "in the conduct or furtherance of a business or vocation." The quoted language appears in the definition of "air commerce"[18] (which is subject to safety regulation), but does not appear in the definition of "air transportation"[19] (which is subject to economic regulation). Petitioners conclude that Congress intended flights "in the conduct or furtherance of a business or vocation" to be excluded from economic regulation. We think this construction is unwarranted. The coverages of safety and economic regulation under the Act are different. Economic regulation is limited to common carriage and the carriage of mail, but safety regulation is extended as far

16. The futility of following the petitioners in a search through the decisions at common law or under state statutes for an absolute meaning for the phrase "compensation or hire" is suggested by the fact that of the four cases most nearly in point which are cited by the parties, two hold in one direction and two in precisely the opposite. Compare Chala v. Gordon, 26 P.U.R.3d 47 (Cal.P.U.C. 1958), and Village of Brookfield v. Goldblatt Bros. Inc., 33 P.U.R.(N.S.) 82 (Ill. C.C.1940), cited by respondent, with Re Larchmont Apartments, Inc., 16 P.U.R. 3d 45 (N.Y.P.S.C.1956), and Yellow Cab v. Skyways Service Co., 36 P.U.R.3d 154 (Colo.P.U.C.1960), cited by petitioners.

17. And, of course, the furnishing of private carriage on a gratuitous basis is not at all unusual. The carriage of officers, employees and selected customers in company-owned planes is an example. Even this is a matter of degree, and miscellaneous carriage of this type could move

into the area of common carriage and become subject to the Act if sufficiently expanded and regularized. For a situation of the character referred to which the Board held to be outside the scope of the statute's economic regulations, see Pan American Ferry Flight Case, 18 C.A.B. 214, 219 (1953).

18. 49 U.S.C.A. § 1301(20) reads:
"'Interstate air commerce', * * * mean[s] the carriage by aircraft of persons or property for compensation or hire, or the carriage of mail by aircraft or the operation or navigation of aircraft, in the conduct or furtherance of a business or vocation * * *" in interstate commerce.

19. 49 U.S.C.A. § 1301(21) reads:
"'Interstate air transportation', * * mean[s] the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft * * *" in interstate commerce.

as the commerce power will permit.[20] There is nothing to indicate that Congress intended that the statutory definitions applicable to the coverage of one should limit the other, and it would subvert the economic purposes of the Act to hold that they do.[21]

■ Petitioners urged the Board to exclude them from the coverage of the economic regulations of the Act through application of the "primary business doctrine," which was developed by the Interstate Commerce Commission under the Motor Carrier Act [22] and which has been codified as a part of that Act.[23] The Board properly declined to do so. The Board found adequate grounds for distinguishing the present case from Motor Carrier Act cases involving the "primary business doctrine," even assuming the applicability of that doctrine to cases arising under the Federal Aviation Act.[24] Moreover, the two statutes are so dissimilar that the use of the doctrine in Federal Aviation Act cases could be of little

help at best, and would involve constant risk of producing results inconsistent with the purposes and administrative scheme of that Act.[25]

The Motor Carrier Act specifically defines the terms "common carrier," "contract carrier," and "private carrier" for the purposes of that Act and provides separately for the economic regulation of each of the first two.[26] The "primary business doctrine" is used to distinguish "common" and "contract" carriers, as defined, from "private" carriers, also as defined. The Federal Aviation Act, on the other hand, contains no definition of the common carriage to which the economic regulations of that Act apply, and neither "contract" carriage nor "private" carriage is defined or even mentioned. It would be wholly unjustified simply to assume that the two latter concepts are to be applicable in Federal Aviation Act cases and that they are to have the precise meaning attached to them in the definitions of the Motor

20. "In general, the safety provisions apply to any aircraft, airman, or flight of aircraft." NEAL, The Status of Non-Scheduled Operations under the Civil Aeronautics Act of 1938, 11 Law & Contemp.Prob. 508, 509 (1946).

21. Petitioners also point out that the phrase "operation of aircraft in furtherance of a business" appeared in an early draft of the definition of "air transportation" and was later omitted. RHYNE, Civil Aeronautics Act Annotated, pp. 42–43, 71–72 (1939). This indicates to us only that Congress decided that the economic coverage of the Act should be co-extensive with air common carriage—that it should include transportation conducted in furtherance of a business when it was common carriage, and should exclude it when it was not.

22. The doctrine is fully reviewed in the Interstate Commerce Commission's opinion in Woitishek Common Carrier Application, 42 M.C.C. 193 (1943).

23. 49 U.S.C.A. § 303(c), which provides in pertinent part "nor shall any person engaged in any other business enterprise transport property by motor vehicle in interstate or foreign commerce for business purposes unless such transportation is within the scope, and in furtherance, of a primary business enterprise

(other than transportation) of such person." (Emphasis supplied.)

24. The Board pointed out that these cases involved the transportation of property only, and not persons; that the transporters were the owners, lessees, or bailees of the goods transported (see 49 U.S.C.A. § 303(a) (17)); and, most important, that there had been no holding out of service to the public.

25. Even if the relevant provisions of the Federal Aviation Act and the Motor Carrier Act were identical, it would be questionable wisdom for the Board to borrow a legal doctrine which the Interstate Commerce Commission and the courts have surrounded with the complexities which now encumber the "primary business doctrine." One commentator finds the decisions in the area "strange and baffling." PORTER, Federal Regulation of Private Carriers, 64 Harv.L.Rev. 896, 902 (1951). Not the least of the difficulties is that the doctrine requires an inquiry "into the corporate psyche" to determine whether the corporation did or did not intend to profit from the transportation, as such. Id., at 903.

26. The definitions appear at 49 U.S.C.A. § 303(a) (14), (15), and (17). And see 49 U.S.C.A. §§ 306 and 309.

Carrier Act and in the case law under that statute—yet an uncritical borrowing of the "primary business doctrine" would assume just that.

The two statutes differ in another respect relevant to this problem. The statutory scheme of the Motor Carrier Act contemplates that all "common" and "contract" carriage by motor vehicle subject to that Act will be conducted under certificates of public convenience and necessity or permits issued by the Commission, except as the statute itself specifically exempts certain classes of these carriers.[27] Quite unlike the Motor Carrier Act, the Federal Aviation Act provides for broad economic regulation of common carriage without specific exemptions and vests in the Board itself the authority in appropriate circumstances to exempt carriers which would otherwise be subject to economic regulation.[28] Thus, the Federal Aviation Act establishes a flexible system enabling the Board to provide an initial period in which new types of air transportation can be developed free of onerous regulations, to be brought into the regulatory pattern of the Act when they mature and under conditions consistent with their particular needs.[29] This does not mean that the Board is left at large to extend or limit the coverage of the economic regulations of the Act as it may

27. 49 U.S.C.A. §§ 306 and 309. Because of the peculiar structure of the Motor Carrier Act, the application of the "primary business doctrine" to cases under the Federal Aviation Act would, in effect, borrow a general doctrine based upon the Motor Carrier Act and at the same time decline to borrow an exception to that doctrine founded in the express provisions of the Motor Carrier Act—thereby producing a result exactly opposite to that which would have been reached by the Interstate Commerce Commission under its own Act. Section 203(b) (3) of the Motor Carrier Act (49 Stat. 543, 49 U.S.C.A. § 303(b) (3)) specifically exempts from that Act motor vehicles used to carry passengers between hotels and common carrier stations, and the Commission has held that this express exemption indicates a congressional intention that the carriage of passengers between hotels and points other than common carrier stations (as in the present case) is within the coverage of the Motor Carrier Act, the "primary business doctrine" to the contrary notwithstanding. Shores and Brown, 26 M.C.C. 243, 244 (1940). Thus, petitioners argue that the "primary business doctrine" requires their exemption from the Federal Aviation Act, although as a motor carrier conducting the same operation they would clearly not be exempt from the Motor Carrier Act. See also 49 U.S.C.A. § 303(b) (9) which exempts casual carriage by a person not engaged in transportation unless, as in the present case, the transportation is offered for sale by brokers who also sell transportation service furnished by certificate carriers.

28. 49 U.S.C.A. § 1386.

29. Large Irregular Air Carrier Investigation, —— C.A.B. —— (1959), CCH Aviation Law Reporter, C.A.B. Cases 1958–1960, ¶22,247 at 14,389–90:
"The Board over the years, pursuant to its promotional responsibilities, has furthered the system's evolution and growth by the certification of new air carriers and by awarding new service authorizations to existing carriers. Thus, the Board has fostered the creation of local service carriers, all-cargo carriers, helicopter carriers, and has brought into the area of international, overseas, and territorial air transportation both newly created carriers and those who were previously confined to domestic operations only. The significant milestones in this evolution have been the introduction of new and often distinctive services or types of service to the public, regardless of whether they were provided by existing carriers or new entrants. In authorizing these services, the Board has frequently employed both its certification and its exemption powers, with exemptions sometimes constituting a precursor to certification in the development of a particular service or field of service until its proper place in the nation's air transportation system had been established."

See also American Airlines, Inc. v. Civil Aeronautics Board, 231 F.2d 483 (D.C. Cir. 1956). Under present regulations exemptions are applicable to large irregular air carriers (14 C.F.R. § 291); Alaska air carriers (14 C.F.R. § 292); military operations carriers (14 C.F.R. § 294); indirect air carriers (14 C.F.R. § 296); international air freight forwarders (14 C.F.R. § 297); and air taxi operators (14 C.F.R. § 298).

deem expedient,[30] but it does suggest that the intentionally flexible operation of this statute ought not to be frustrated by the introduction of a doctrine based upon a different, and much more rigid, statutory scheme.[31]

### III

■ The petitioners argued here and to the Board that the Hacienda flights are in the public interest in that the service is unique, operates at hours at which scheduled carriers do not fly, requires no government subsidy, and serves to introduce the public to the advantages of air travel. The Board properly held that these considerations are irrelevant to the only question in this enforcement proceeding—whether the operation involved is subject to the jurisdiction of the Board under Section 1371 of the Act.[32] On the other hand, these and similar factors would, of course, be relevant in a proceeding to determine whether a certificate or exemption order should issue. The

Board's instructions from the Congress include an injunction to foster "competition to the extent necessary to assure the sound development of an air-transportation system * * *,"[33] and the Board has shown itself to be receptive to initiative and experimentation in the area subject to its regulatory control.

### IV

■ The petitioners' argument that the Board's order is unsupportably broad is disposed of for this Circuit by the decision in Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board, 213 F.2d 814, 818 (9 Cir. 1954),[34] in which a similar order was upheld as sufficiently particularized by reference to the Board's complaint, investigation, and opinion. A reading of the complaint and opinion of the Board in the present record will sufficiently apprise the petitioners of the conduct complained of, and now enjoined.[35]

30. The Board may exempt a carrier from requirements of the Act "only if it first finds that enforcement of those requirements would have certain specified results because of the existence of certain specified conditions" as recited in the Act. Pan American World Airways v. Civil Aeronautics Board, 104 U.S.App.D.C. 288, 97 U.S.App.D.C. 324, 261 F.2d 754, 757 (D.C.Cir. 1958), cert. denied Seaboard & Western Airlines, Inc., v. Civil Aeronautics Board, 359 U.S. 912, 79 S.Ct. 589, 3 L.Ed.2d 575 (1959).

31. We have been warned of the impropriety of assuming that Congress intended that judicial precedents and rules of interpretation applicable to the regulation of other forms of transportation were to be applied to the regulation of transportation by air:
"However useful parallels with older forms of transit may be in adjudicating private rights, we see no reason why the efforts of the Congress to foster and regulate development of a revolutionary commerce that operates in three dimensions should be judicially circumscribed with analogies taken over from two-dimension transit." Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 108, 68 S.Ct. 431, 434, 92 L.Ed. 568 (1948).

32. Pacific Northern Airlines, Inc. v. Alaska Airlines, Inc., 80 F.Supp. 592, 609 (D.Alaska 1948).

33. 49 U.S.C.A. § 1302(d).

34. See also Bingler Vacation Tours, Inc. v. United States, 132 F.Supp. 793, 798 (D.N.J.1955), affirmed 350 U.S. 921, 76 S.Ct. 211, 100 L.Ed. 806; Brady Transfer & Storage Co. v. United States, 80 F.Supp. 110, 118 (S.D.Iowa 1948), affirmed 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418.

35. Although we sustain the order of the Board in the circumstances of this case, the form employed is not a desirable one. It should not be too difficult for the Board to frame an order prohibiting the illegal conduct in terms of objective criteria narrower than the statute yet broader than the precise facts of the particular case. Contrary to the Board's argument, to advise a respondent what it may not do, in such terms, is scarcely the equivalent of telling it how it may violate the law. The Board, like other regulatory agencies, has wide latitude in framing the appropriate remedy in a given case. Jacob Siegel Co. v. F.T.C., 327 U.S. 608, 611, 613, 66 S.Ct. 758, 90 L.Ed. 888 (1946). It is not confined to prohibiting the precise conduct found to be unlawful, for that, of

## V

■ The petitioner Price earnestly argues that he acted only as a salaried employee of Hacienda, and that the Board's cease and desist order therefore should not have been directed against him as an individual. If the Board finds that "any person has failed to comply with any provision" of the Act, it "shall issue an appropriate order to compel such person to comply therewith." [36] The Board here found that Price "is engaged in interstate air transportation as a common carrier for compensation or hire * * * without authority from the Board in violation of Section 401(a) of the Act." We know of no authority holding that Price's status as a corporate employee insulated him from the requirements of the Act. S. E. C. v. Universal Service Ass'n, 106 F.2d 232, 238 (7 Cir. 1939), certiorari denied 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519, expressly holds to the contrary under the Securities Act of 1933 with respect to an attorney and corporate officer. This court's holding in Consolidated Flower Shipments, Inc. v. Civil Aeronautics Board, 213 F.2d 814 (9 Cir. 1954) does not aid petitioners. Indeed, an examination of the record in that case discloses that the order of the CAB which was affirmed by this court included an injunction against an individual officer of the corporate petitioner.

The question remains, however, whether the Board's finding that Price engaged in "air transportation" without a certificate of convenience and necessity from the Board was supported by substantial evidence. The evidence was ample that Price supervised the physical operation of the aircraft involved in the "Champagne Tours" and, of course, those operations admittedly were not certificated. However, the illegality of the uncertificated flights arose from the holding out (primarily through advertising, ticket sales, and similar activities) that the flights were available to the general public for compensation or hire. There is an occasional suggestion in the record that Price may have participated in this phase of the "Champagne Tour" operation as well, and that the Board concluded, from circumstances outside the record, that Price was in fact the effective organizer of both the "Champagne Tours" and of other, earlier violations of Section 1371. But these are occasional suggestions only, never pursued or developed in the record, and the Board's order must stand or fall upon the record as actually made. We conclude that as to Price the record is insufficient. Of course the order will continue to bind Price as well as others who may be "agents, successors and assigns" of Hacienda.

The order of the Civil Aeronautics Board is modified by striking the words "and Henry F. Price, individually and as agent and/or manager of the flight division of Las Vegas Hacienda, Inc.," and, as modified, is affirmed.

course, would make evasion so simple as to invite it, and would render the order futile. F. T. C. v. Morton Salt Co., 334 U.S. 37, 52–53, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). The Board may enjoin unlawful practices reasonably related to those in which the respondent has indulged. F. T. C. v. Mandel Brothers, Inc., 359 U.S. 385, 392–393, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); F. T. C. v. National Lead Co., 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); International Brotherhood of Electrical Workers v. N. L. R. B., 341 U.S. 694, 705–706, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). Such related acts may be enjoined in generic terms, provided that the conduct prohibited is reasonably identified and the injunction is based upon properly supported findings of a proclivity to unlawful activity. F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 456, 42 S.Ct. 150, 155, 66 L.Ed. 307 (1922) ("any other equivalent co-operative means of"); N. L. R. B. v. Globe Wireless Ltd., 193 F.2d 748, 752 (9 Cir., 1951) ("in any manner"). Compare Puerto Rico Drydock & Marine Terminals, Inc. v. N. L. R. B., 109 U.S.App.D.C. 78, 284 F.2d 212, 216 (D.C.Cir. 1960), cert. denied 364 U.S. 883, 81 S.Ct. 172, 5 L.Ed.2d 104 ("in any other manner"). See also N. L. R. B. v. Cheney California Lumber Co., 327 U.S. 385, 387–389, 66 S.Ct. 553, 90 L.Ed. 739 (1946) ("in any other manner").

36. 49 U.S.C.A. § 1482(c).