**VOYAGER 1000, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD, Respondent.**

No. 73-1222.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1973.

Decided Nov. 14, 1973.

Karl J. Stipher, Indianapolis, Ind., for petitioner.

Howard E. Shapiro, Chief, Appellate Section, U. S. Dept. of Justice, Warren L. Sharfman, Robert L. Toomey, Civil Aeronautics Board, Washington, D. C., for respondent.

Before PELL and SPRECHER, Circuit Judges, and CAMPBELL, Senior District Judge.*

SPRECHER, Circuit Judge.

Petitioner, Voyager 1000, seeks review of Order 73–3–1 issued by the Civil Aeronautics Board on March 1, 1973, directing petitioner to cease and desist from engaging in "air transportation" in violation of Section 401(a) of the Federal Aviation Act.[1] Section 401(a) of the Act states that "[n]o *air carrier* shall engage in any *air transportation* unless there is in force a certificate [of public convenience and necessity] issued by the Board authorizing such air carrier to engage in such transportation." 49 U. S.C.A. § 1371(a) (emphasis added). The issue presented on appeal is whether the Board's determination that Voyager was operating as an air carrier engaged in air transportation is supported by substantial evidence [2] and a reasonable basis in law. Las Vegas Hacienda, Inc. v. C.A.B., 298 F.2d 430, 433–434 (9th Cir. 1962). We affirm the Board's order.

I

In September, 1964, Voyager was founded as an Indiana non-profit corporation.[3] The founding members' plan was to organize a private flying club which would acquire an aircraft for recreational travel for a membership limited to 1000. Each member was required to pay an initiation fee of $125 ($200 per family membership) and monthly dues of $4, although in some instances these amounts were waived or reduced. The membership having reached 1,000 within a year, a second club, Voyager 2000, was formed and subsequently merged into Voyager 1000.

In early 1968 when the membership stood at 2,460, the club's cash resources were seriously depleted. The directors decided that a substantially larger dues paying membership was necessary to provide sufficient operating funds to keep the club on a healthy financial footing. The initial goal was set at

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. The Federal Aviation Act of 1958, 72 Stat. 731, 49 U.S.C. § 1301 et seq. (1970) [hereinafter cited as the Act].

2. Section 1006 of the Act delineates the limits of judicial review of C.A.B. orders, providing in pertinent part that "findings of facts by the Board or Administrator, if supported by substantial evidence, shall be conclusive." 49 U.S.C. § 1486(e).

3. Under the Indiana Not-For-Profit Corporation Act of 1971 (Burns Ind.Stat.Ann., §§ 25–501 to –566 (Cum.Supp.1972)), in the event of dissolution all assets in excess of obligations to creditors and lenders escheat to the state. Burns Ind.Stat.Ann. § 25–533.

5,000 members; in September, 1970, the goal was increased to 20,000.

Membership drive activities included the following:

(a) Familiarization with Voyager programs and facilities was proffered by means of open houses held in early 1968 in Indianapolis, Fort Wayne, Evansville, and Terre Haute, Indiana, and Columbus, Ohio. Newspapers in Indianapolis, Louisville and Cincinnati carried advertisements. When a Boeing jet was acquired, open houses to inspect this craft and "hear the Voyager 1000 story" were also held; these too were widely publicized. From June to September 1970, published announcements included lists of upcoming Voyager flights, stressed that the only initial outlay would be the advance payment of six months due ($36) because the initiation fee was being waived, and stated that application forms would be available at the open house.

(b) Articles describing Voyager activities were prepared for publication in newspapers and magazines such as *Time* and *Travel Weekly*. During the last three months of 1970, from three to six commercials per week were broadcast over a Cincinnati radio station. In the spring of 1971, a full page advertisement was placed in *Holiday Magazine*.

(c) Existing Voyager members were offered the inducement of $10 in scrip redeemable in Voyager services for each "bonus membership" they procured.[4]

(d) Brochures describing flight programs in detail—dates, flight numbers, departure times, and fares—were mailed to non-members appearing on purchased commercial mailing-house lists and on large organization membership lists such as the Indiana State Teachers Association. For example, in the spring of 1972 Voyager had 100,000 copies of the "Europe '72 Program" brochure printed,

more than seven times the then current membership.

(e) In early 1971, college students at Purdue University, Ball State Teachers College and Marion College were offered a one-year membership for $10. Free flights were offered to the individuals enrolling students.

(f) As part of the membership drive, the initiation fee and monthly dues were the subject of some variation, being waived or reduced in connection with particular programs. At the time of this proceeding, the cost of joining was $10 per membership and $7 per months.

(g) Throughout the period of the membership drive, advertisements appeared regularly in eight newspapers in Indiana, Ohio, and Kentucky with a combined circulation in excess of one million copies. These advertisements contained a selected listing of flights available to "Voyager Members Only" detailing dates and price per person. They also invited inquiry about membership, giving a phone number or containing a mail-in coupon. Many advertisements included the cost of membership.

This total effort resulted in approximately 12,100 new memberships, from 2,400 members in 1968 to 14,500 members in December, 1971. Since most memberships are owned by families, this represents an estimated 43,000 individuals eligible for Voyager flights.

As a result of increased membership, Voyager employs over 80 individuals, operates seven aircraft (a Boeing 720 jet, two Lockheed Electras, two DC-7's and two Martin 404's), and maintains its own terminal at Weir Cook International Airport in Indianapolis.

Voyager's flight program is extensive. Flights are announced from five to six months in advance and by flight time are generally filled to capacity.[5] Although the Voyager program tends to concentrate on weekend trips and desti-

---

4. This approach resulted in 1,600 members by May 1, 1969, with bonus memberships coming in on an average of 25 a day.

5. During the 12 months prior to the institution of this proceeding, Voyager carried some 24,000 members.

nations which are novel, longer trips and more customary destinations are also available. Voyager operated 200 flights from March, 1970 to May, 1971 and 156 flights between July, 1971 and April, 1972.

Although concededly secondary to travel, there is also a social aspect to the club. Voyager conducts a series of parties planned around travel themes. Announcements are sent to members sometimes in combination with flight schedules; they include a reservation form and often encourage members to bring guests.

Participation in Voyager flights, parties and corporate elections [6] is limited to members whose dues are paid up. Immediately upon payment of the fee necessary to become a member, an individual is eligible for all Voyager activities and could conceivably take a Voyager flight scheduled for that same day if passage was available.

On November 16, 1971, the Director of C.A.B.'s Bureau of Enforcement (B. O.E.) docketed a complaint against Voyager alleging that Voyager was operating as a common carrier for compensation or hire without authority from the Board in violation of § 401(a) of the Act. The alleged aspects of common carriage included Voyager's mass media campaign for new members and the lack of eligibility qualifications for membership other than the payment of fees and dues. Following evidentiary proceedings, the Administrative Law Judge issued his initial decision with order attached on June 22, 1972, dismissing the petition for enforcement and the complaint. The B.O.E. petitioned for discretionary review of the initial decision, and the Board undertook review. On March 1, 1973, the Board issued its decision reversing the Administrative Law Judge.

II

Economic and safety regulation of air transportation is provided by the Federal Aviation Act. Engaging in air transportation is conditioned upon obtaining the appropriate economic authority from the Civil Aeronautics Board (49 U.S.C. §§ 1371–1387) and safety authority from the Administrator of the Federal Aviation Agency (49 U.S.C. §§ 1421–1431). Voyager 1000 has operated since 1968 under Part 123 of the Federal Aviation Regulations entitled "Certificate and Operations: Air Travel Clubs Using Large Airplanes." 14 C.F.R. §§ 123.1–53 (1973). Part 123 basically tailors the commercial operator certification and safety standards of Part 121 (14 C.F.R. § 121.1 et seq.)[7] to air travel club (A.T.C.) characteristics. 33 Fed. Reg. 12887 (1968). Economic authority is not required for the issuance of an operating certificate under Part 123. Certification of a person by the F.A.A. as an air travel club under Part 123 does not authorize operations as an air carrier in air transportation. 14 C.F.R. § 123.1(c).

> An air travel club is, by definition, a "person who engages in the carriage by airplanes of persons who are required to qualify for that carriage by payment of an assessment, dues, membership fee, or other similar type remittance."

14 C.F.R. § 123.1(b). An air travel club differs from commercial operators in that the operations are nonprofit, air schedules are sporadic, and aircraft are operated for a relatively small number of hours. 33 Fed.Reg. 12887 (1968).

Although the reasons for requiring safety regulation of air travel clubs are

---

6. Membership confers certain rights similar to those held by shareholders of a business corporation including the right to notice of elections and rights to nominate and vote on directors.

7. A commercial operator is defined as "a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property, *other than as an air carrier* . . . . " 14 C.F.R. § 1.1 (emphasis added).

well defined,[8] the reasons for allowing their operation outside the economic regulatory scheme in the first instance have not been clearly articulated. Apparently at the outset these clubs were so small and the members were so intimately related that their operations were simply not relevant in any respect to commercial aviation. During the 1960's, however, the F.A.A. noted the growth of a different kind of organization.

"During the past few years, a number of travel clubs have been formed for the purpose of providing their members with long-distance travel usually on large (over 12,500 lbs. takeoff weight) aircraft. In most cases, these clubs operate on the basis that the members share the expenses of the travel by an assessment, dues, membership fee, or similar payment to the club."

32 Fed.Reg. 10311 (1967). When the F.A.A. was considering applying the safety standards of Part 121 to A.T.C.'s, the C.A.B. probably participated, as it normally does, in the making of the proposed rule by communicating its opinions and suggestions. These communications have not been disclosed. In the present proceeding, the B.O.E. avoided setting out its concept of the proper basis for distinguishing A.T.C.'s from common carriers.

"The Bureau takes no position on what criteria should be used to distinguish between valid private flying clubs and common carriers, for purposes of the Board's jurisdiction." Record at 827.

In 1971, the F.A.A. was of the opinion that air travel club operations constituted private carriage:

"It is of the opinion [sic] of the FAA that as long as air travel club aircraft are owned by the club members on a non-profit basis, solely for the carriage of its members on pleasure trips, these aircraft should be regarded as private carriage versus common carriage by commercial operators." [9]

However, no attempt was made to set out the underlying reasons why such operations were not considered to present competition injurious to the regularly scheduled airlines except to note that A.T.C.'s do not transport for compensation or hire.

"As air travel clubs are a non-profit organization, they are not allowed to fly passengers or cargo for hire. Therefore, they are not required to, or allowed to secure from the CAB a Certificate of Convenience and Necessity, as required by commercial operators." [10]

Clearly this is an insufficient rationalizing principle since the effect of being non-profit is that A.T.C's provide transportation at a price which does not include a profit factor. What could present stronger competition to the commercial airlines?

Because the Act ultimatley defines air transportation as "carriage by aircraft . . . as a common carrier," [11] the

---

8. "From a safety standpoint, when a passenger has, in any manner, paid for his carriage aboard a large aircraft the FAA believes that the applicable safety standards should not depend on a distinction as to whether that passenger is carried for 'compensation or hire' or is 'sharing expenses' with other passengers. The average passenger certainly is not aware that the method by which he pays for his carriage determines the level of safety that the operator of the aircraft is required to maintain. Except for the method of payment, the typical travel club operation is in all practical respects no different from a charter flight conducted by a commercial operator, and the FAA believes that

the level of safety required by Part 121 should be maintained." 32 Fed.Reg. 10311 (1967).

9. Opinion Letter from F.A.A. to Voyager 1000, Aug. 2, 1971. Record at 629.

10. *Id.*

11. Section 101 of the Act defines "air carrier" as

"any citizen of the United States who undertakes, whether directly or indirectly or by a lease or other arrangement, to engage in air transportation . . ." 49 U.S.C. § 1301(3). "Air transportation" is defined as "interstate, overseas, or foreign air transportation . . ." (49 U.S.C.

Board's determination that Voyager is an air carrier engaged in air transportation (which, in the absence of a certificate of public convenience and necessity, is in violation of Section 401(a) of the Act) is based on its finding that Voyager is operating as a common carrier. Although the Act itself does not further define common carriage, this term is of an ancient legal vintage. Narrowing the broad range of possibly applicable definitions are the stated purposes underlying the regulatory functions of the C.A. B.

"The Civil Aeronautics Board is under an affirmative statutory duty to exercise its regulatory powers over 'air transportation' so as to foster sound economic conditions, promote economical and efficient service at reasonable charges, and avoid destructive competitive practices. The legislative history of the Act emphasizes the importance attached by the Congress to the achievement of these purposes. Obviously the economic regulation contemplated by the statute can be effective only if the commercial activity to which it is made applicable—'air transportation'—represents a reasonably discrete market in practical business terms." [12]

Thus the Board's attempt to define common carriage is an attempt to delineate that market which is the object of the regulatory scheme—"the furnishing of transportation by air to the general public on a commercial basis." *Las Vegas Hacienda,* 298 F.2d at 436.

We would agree that "the typical travel club operation is in all practical respects no different from a charter flight conducted by a commercial operator . . . ." (*Supra* note 8), at least for the limited purpose of appraising their competitive impact on commercial airlines. The market served by Voyager is strikingly similar to the charter flight market.

The recent opinion by the Second Circuit in Saturn Airways, Inc. v. C.A.B., 483 F.2d 1284 (1973) upholding the Board's promulgation of regulations providing for a new type of charter, the Travel Group Charter (T.G.C.) is instructive. Inasmuch as charter trips are provided by supplemental air carriers pursuant to a certificate of public convenience and necessity (49 U.S.C. § 1371(d)(3)), the question involved in *Saturn* was not one of common carriage status. Nevertheless, the validity of the Board's authorization of T.G.C.'s was determined by reference to the importance of the distinction between individually ticketed and group fare markets and the appropriate line to be drawn between the two.

"The supplemental air carriers, once known as 'non-scheduled' or 'irregular' air carriers, are meant to provide a supplementary service to that of the scheduled or trunkline carriers, who offer individually ticketed, regularly scheduled service to the general public. Since the supplementals are not subject to the economic rigors attendant upon a regularly scheduled, individually ticketed service, for they essentially fly when they desire and nearly always carry a full planeload of passengers, the air fares for comparable routes on charter flights can be significantly less than those offered by the scheduled air carriers. Congress in providing for certification of the supplementals recognized the potential problem of competition and the real possibility that if not carefully controlled they would supplant, rather

---

§ 1301(10)), terms which are respectively defined as

"the carriage by aircraft of persons or property as a *common carrier* for compensation or hire . . . in commerce . . ."

between states, between states and Territories or possessions, and between the United States and any other place. 49 U.S.C. § 1301(21) (emphasis added).

12. Las Vegas Hacienda, Inc. v. C. A. B., 298 F.2d 430, 432–433 (9th Cir. 1962) (footnotes omitted).

than supplement, the regularly scheduled service. *See generally* American Airlines, Inc. v. CAB, *supra,* 125 U.S. App.D.C. 6, 365 F.2d 939, at 944–945. Individually ticketed, regularly scheduled service is the mainstay of an efficient air transportation system, and a critical necessity in any sophisticated economy. Congress realized that it must be preserved. Accordingly, the legislative history and language of the statute itself manifest a congressional intent that although the Board should have the power of definition, it should never permit 'individually ticketed service to be offered to the general public under the guise of charter.' Sen.Rep. No. 688, 87th Cong., 1st Sess. 13 (1961)." (483 F.2d at 1287–1288).

The court concluded that the T.G.C. regulations, "where individual travelers without a community of interest apart from transportation are organized by a third party and . . . charter an aircraft on a pro rata basis" (483 F.2d at 1287), adequately preserve the distinction between group and individually ticketed markets where differences such as the following are required: (1) charter travelers are liable for a pro rata share of the cost which share is subject to variation depending upon the final load factor; (2) the group must be formed and members must have paid 25 percent of the minimum charter price not later than three months prior to the scheduled departure time; (3) participants must pay the total remaining balance of the flight fare not later than two months prior to the departure date; (4) the deposit and balance payments are with certain exceptions non-refundable; (5) the flight may be cancelled up to 45 days prior to departure due to passenger defaults; and, (6) participants must depart and return as a group sub-ject to predetermined trip duration restrictions. 483 F.2d at 1292; See 14 C. F.R. §§ 372a.1–.50.

■ The distinguishing factors cited by the court are ones which eliminate from charter service those members of the traveling public who require transportation on short notice without risk of cancellation or restrictions on return accommodations.[13] The Board's determination in the instant case revolved around the relevant characteristics of petitioner's operation which failed to eliminate from A.T.C. service members of the individually ticketed market.

■ The cases setting forth the principles applicable to the determination of common carrier status interpret the Act as "bringing within the regulatory scheme all those who compete in the commercial market in the business of offering air transportation to the public generally." *Las Vegas Hacienda,* 298 F.2d at 434. To ascertain whether a particular operation is so competing, the critical determination is whether the operation is one which holds itself out "as ready and willing to undertake for hire the transportation of passengers or property from place to place, and so invites the patronage of the public." Transocean Air Lines, Inc., Enforcement Proceeding, 11 C.A.B. 350, 352 (1950). In the instant case, the Board examined both the nature of the "membership drives" and the extent of qualifications for membership as they relate to a "holding out to the public or a segment of the public."

"The breadth of the activities contemplated under the term 'common carrier' reflects the great variety of recognized means whereby the 'holding out' may be accomplished. The most obvious method of a holding out which may result in common carriage

13. The court's analysis quite properly demonstrated the limitations on the Board's affirmative statutory duties. The desired result is not to remove all operations which compete with commercial airlines but rather to regulate only those operations which affect the economic soundness of regularly scheduled point-to-point air transportation. The economic stability of commercial airlines is to be preserved not for the benefit of the airlines *per se* but only insofar as that stability is necessary to the maintenance of an adequate national and international transportation system.

is advertising through magazines, newspapers, posters, brochures, and the like. Should the evidence disclose that a carrier has advertised its services in such manner as to solicit business from the general public, the necessary implication arises that it has held itself out as being in readiness to carry for all who might apply. Nevertheless, the lack of advertising is not in itself determinative of whether there has been a holding out since a holding out may take place through other methods.

". . . [T]he requisite holding out may be evinced by any means which communicates to the public that a transportation service is indiscriminately available. A reputation gained through merely serving the public indiscriminately may be sufficient in itself to inform the public that the carrier will carry for all who apply within the limits of its facilities.

"Furthermore, it is clear that a carrier need not undertake to serve all the public in order to be considered a common carrier, but may limit its transportation services to a class or segment of the general public so long at it expresses a willingness to provide transportation for all within this class or segment indiscriminately." Transocean Air Lines, 11 C.A.B. 352–53 (footnotes omitted).

Regarding the propriety of the membership drives, Voyager argued that its advertisements were announcements to members coupled with invitations to join, that advertising is permissible so long as its thrust is to acquaint nonmembers with the advantages of membership, that solicitation of new members generally is proper so long as such solicitation is not designed to sell individual flights to members of the public, and that in any event there was no evidence that such advertising diverted passengers from common carrier flights.[14]

With respect to the qualifications for membership, petitioner argued that it does not hold itself out as willing to carry all passengers but only members; that Voyager membership does not constitute a segment of the general public because the fees represent a real and substantial investment and are an absolute prerequisite to participation; that the members have a legal interest in the club's assets until dissolution, and the social aspects of the club differentiate the membership from the traveling public; and, that as a practical matter the members do not receive individually ticketed service.[15]

Concerning the contention that the membership drive activities constituted a "holding out", the Administrative Law Judge concluded as follows:

"The Bureau reads the advertising program as being directed to members of the public generally and as inviting them to fly Voyager as though it were a commercial enterprise. . . .

"The respondents deny that this was the purpose, either overt or covert, and the evidence sustains them. The adds [sic] clearly stated that the trips were available only to Voyager members. Insofar as their placement was part of a campaign to increase the membership that was the exercise of a legitimate right as long as the

14. The record shows that in a typical month, November, 1971, out of 15 Voyager destinations only two such destinations were advertised by travel agents. In conversations with travel agents, petitioner found that its elapsed time was less than half that of the best common carrier service in five of eight examples.

15. In 1971, Voyager conducted a survey of its membership based on a random selection of 200 members. Every fiftieth member on the Master Membership files who was current in dues payment was selected and a questionnaire was sent to him or her. Among other things, the totals showed that the average time between joining and traveling was 5½ months. The survey does not provide information on individuals who had stopped paying dues. The record does not show the average time between making reservations and flying.

original purpose of the club was not being changed. The listing of prospective flights and the costs can be fairly read as an effective device to illustrate the advantages of being a member. It was certainly effective as part of the expansion plan. If in its concept Voyager was a private club engaging in private carriage, as it clearly was, simply increasing the number of members does not add an insidious noted [*sic*]."

The Administrative Law Judge further concluded that advertising directed to prospective members does not constitute solicitation of the general public; Voyager advertisements contained "an element of selectiveness in that they were addressed to persons travel-minded in the manner of the original Voyager members."

In assessing the qualifications for Voyager membership in terms of their effectiveness in differentiating members from the general public, the Administrative Law Judge found that although

"there is little or no screening of an applicant beyond the payment of initiation fee and dues there is a built-in screening by the mere fact of application for membership. By such application, particularly after exposure to explanations of the purposes of the club, an applicant, inferentially but effectively, declares an affinity with the existing members."

Furthermore, the Administrative Law Judge viewed the financial outlay as real and substantial when viewed in the aggregate.

 The Board reversed the initial decision of the Administrative Law Judge on the basis of the legal significance of the facts as found. The cases and the purposes underlying the regulatory scheme support the Board's decision.

The fact that petitioner believed that it was engaged in private carriage and had no intention of violating the law is not determinative of the question.

Petitioner's claims of uniqueness, capacity to provide faster and more convenient service, and ability to offer air travel to individuals unable to afford commercial rates all relate to the question of whether a certificate or exemption should issue and not to the determination of common carrier status. *See Las Vegas Hacienda*, 298 F.2d at 438–439.

The question of the propriety of mass media advertisements can not be resolved simply by determining whether the ads solicit members, as those in the instant case clearly did. We would agree with the Administrative Law Judge that an increase in the membership does not necessarily result in a transformation from private to public carriage. Rather, the proper inquiry is whether the ads solicit prospective members where the membership is defined in such a manner as to be undifferentiated from the traveling public at large. Thus the fact that the ads are addressed "To Members Only" is not dispositive.

The Administrative Law Judge cites the membership fees and dues and the declared affinity, by virtue of application for membership, with "persons travel-minded in the manner" of the existing members as providing sufficient differentiation from the general public. The Board found the financial outlay to be "relatively insignificant, particularly when viewed in light of the fare bargains it buys."[16] Since the avowed purpose of Voyager is group travel, the affinity involved in Voyager membership is a common interest in travel. To employ affinity in this manner begs the question.

Insofar as the affinity only relates to travel,[17] the nature of the travel services

16. As a practical matter the fees become part of the transportation cost which in total amounts to less than commercial fares.

17. It is not clear how the establishment of a prior affinity among Voyager's members would help petitioner's case. The C.A.B.

provided must be differentiated from the individually ticketed market. Here, members were eligible to fly as soon as they joined and there was no prescribed waiting period between making reservations and flying. The record is void of criteria which would indicate sufficient differentiation between Voyager services and individually ticketed services.

There was substantial evidence and a reasonable basis in law for the Board's finding that "[d]espite the various labels Voyager attaches to itself and to various aspects of its method of operation, it is 'furnishing transportation by air to the general public on a commercial basis' . . . and hence it engaged in 'air transportation' within the meaning of the act."

Order enforced.

PELL, Circuit Judge (concurring).

I concur in the foregoing opinion although I do so with considerable reluctance. My disinclination, however, arises from no feeling that a legally incorrect result has been reached. Indeed, Judge Sprecher's well reasoned opinion leaves little area, it seems to me, for disagreement with the legal premises it sets forth and applies.

It is somewhat ironical, and perhaps to be deplored, that in a society which generally encourages competitive free enterprise a service is to be stifled which a substantial segment of citizenry of the Midwest portion of the country found to be highly desirable in making available travel by air which might not otherwise have been enjoined by them, and which travel has been conducted in full compliance with governmental safety requirements.

While this travel presumably was ordinarily for pleasure rather than. business reasons, the right of such movement is one that has received Supreme Court recognition.

"This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969).

While the further movement of the Voyager members is perforce restricted by our upholding of the administrative determination here involved, we are unable to say that it is not supported by substantial evidence, nor that it is an unconstitutionally unreasonable application of the guidelines laid down by the Congress. That body has as a policy matter legislated where competing interests are involved. It is our function in the judiciary not to make the law but only to determine what it is and whether it exceeds constitutional limitations either as stated or as applied.

---

has recently begun experimenting with the discontinuance of the affinity group concept due to the fact that it discriminates against individuals not belonging to groups which are charterworthy. 37 Fed.Reg. 20808 (1972).

